**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

CARLOS N. WHITEHEAD,                    :

      Plaintiff,                         :

vs.                                     :          CA 12-0246-C

MICHAEL J. ASTRUE,                      :
Commissioner of Social Security,
                                        :
      Defendant.                         :


**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 22 & 24 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the parties' arguments during the hearing conducted on November 8, 2012, it is determined that the Commissioner's decision denying plaintiff benefits should be affirmed.[1]

---

[1]        Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 22 & 24 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of (Continued)

Plaintiff alleges disability due to major depression with psychotic features. The

Administrative Law Judge (ALJ) made the following relevant findings:

> **1.    The claimant met the insured status requirements of the Social Security Act through June 30, 2000.**
>
> **2.    The claimant has not engaged in substantial gainful activity since May 15, 1998, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).**
>
> **3.    The claimant has the following severe impairments: substance abuse disorder, affective depressive disorder, generalized anxiety disorder, personality disorder, and cervical spondylosis (20 CFR 404.1520(c) and 416.920(c)).**

.        .        .

Peter T. Oas, Ph.D., a clinical psychologist, evaluated the claimant on a consultative basis on August 19, 1999. The claimant complained of chest pain and passing out. He reported that he stayed depressed. He reported that he had been in an anger management program, and that he had a history of arrests for domestic violence. He also described a history of many arguments and physical fights, as well as arrests for trespassing, theft, and marijuana possession. He admitted that he was an alcoholic. He complained of irritability and moodiness. Dr. Oas noted that the claimant's chest pain was possibly related to stress. The mental status examination was essentially unremarkable. Dr. Oas reported diagnostic impressions of anxiety disorder, history of polysubstance dependence in remission by report, depression not otherwise specified, and mixed personality disorder.

James G. Brown, Ph.D., a state agency psychologist, reviewed the evidence of record on September 9, 1999. He completed a psychiatric review technique form on which he indicated that the claimant had affective, anxiety, personality, and substance abuse disorders. He estimated slight restriction of activities of daily living and moderate restriction of social functioning. He indicated that the claimant often had difficulties with concentration, persistence or pace, and that there were 1 to 2 episodes of decompensation. Dr. Brown also completed a mental residual functional capacity assessment on which he indicated that the claimant was moderately impaired in ability to maintain attention and concentration for extended periods, in ability to respond appropriately to

---

Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

supervision, in ability to travel independently, and in ability to set realistic goals.

.          .          .

Kent Rowland, Ph.D., a clinical psychologist, evaluated the claimant on February 19, 2001. The claimant reported a history of alcohol dependence, anxiety, and depression. He described a history of physical abuse by his mother and stepfather. He reported drinking a six-pack of beer daily. He stated that he had been arrested on multiple occasions for assault and battery. He reported going into a rage with little memory of it afterward. He complained of agitation, but did not appear to be agitated. Dr. Rowland observed that the claimant's memory and attention were slightly weak, suggesting low average intellectual functioning. The examination was otherwise unremarkable. Dr. Rowland reported diagnostic impressions of anxiety disorder not otherwise specified, intermittent explosive disorder, rule out mental disorder due to neurological cause, rule out dissociative disorder, alcohol dependence, and antisocial personality disorder. Dr. Rowland estimated a global assessment of functioning of 55, which, according to the *Diagnostic and Statistical Manual of Mental Disorders* (4th edition) (*DSM-IV*), indicates moderate symptoms or moderate impairment in social or occupational functioning.

.          .          .

Jane F. Cormier, Ph.D., a state agency psychologist, reviewed the evidence of record on March 12, 2001, and completed a psychiatric review technique form on which she indicated that the claimant had anxiety, personality, and substance abuse disorders. She estimated mild restrictions of activities of daily living and social functioning, as well as a moderate restriction of concentration, persistence or pace. She indicated that the "C" criteria were not present.

.          .          .

The claimant has been treated at Southwest Alabama Mental Health on an intermittent basis since July 2002. Intake notes from July 2002 reflect that the claimant had attended anger management programs at Mental Health on almost a yearly basis since 1987. The claimant reported a history of childhood abuse and a variety of physical complaints. Clay Kelly[] diagnosed post-traumatic stress disorder, personality disorder not otherwise specified, and generalized anxiety disorder, and estimated a global assessment of functioning (GAF) of 55.

From September 2002 through May 2003, John R. Cranton, M.D., a psychiatrist, treated the claimant for post-traumatic stress disorder with anxiety, depression, and possible paranoia. The claimant reported that treatment was beneficial. Dr. Cranton referred him for substance abuse treatment.

3

.     .     .

The claimant went to the emergency room at Evergreen Medical Center on April 16, 2003, for treatment of chest pain. He was treated with an injection of Toradol. He returned on April 19 with bilateral wrist lacerations which were self-inflicted. The claimant denied suicidal ideation and stated that he did not remember cutting his wrists. The lacerations were sutured. The claimant returned to the hospital on April 22 and complained of suicidal ideation. He was admitted, and demonstrated [st]eady improvement with treatment. The diagnoses were alcohol dependence, depression not otherwise specified, generalized anxiety disorder, and personality disorder with features of antisocial personality. The claimant was discharged on April 28.

.     .     .

Robert DeFrancisco, Ph.D., a clinical psychologist, evaluated the claimant on a consultative basis on August 18, 2003. The claimant complained of cardiac arrhythmia, neck and back pain, and depression. He reported a history of drug and alcohol abuse, but stated that he had been sober for the past year and a half. He described a history of childhood abuse and domestic violence as an adult. Dr. DeFrancisco observed that affect was somewhat constricted but appropriate. He estimated upper borderline to low average intelligence. The mental status examination was essentially normal. The claimant reported that his activities of daily living included household chores and occasional hunting and fishing. Dr. DeFrancisco reported a diagnostic impression of pain disorder secondary to general medical condition. He concluded that the claimant had no major mental disturbance, and that the claimant could adequately understand, remember and carry out simple instructions and respond to work pressures.

Patricia Hinton, Ph.D., a state agency psychologist, reviewed the evidence of record on September 9, 2003, and completed a psychiatric review technique form on which she indicated that the claimant had affective, anxiety, somatoform, personality, and substance abuse disorders. She estimated mild restriction of activities of daily living, moderate restriction of social functioning, and moderate restriction of concentration, persistence or pace. She indicated that the evidence was insufficient to make a determination on episodes of decompensation, and reported that the "C" criteria were not present. Dr. Hinton also completed a mental residual functional capacity assessment on which she reported that the claimant was moderately limited in ability to understand, remember, and carry out detailed or complex instructions; in ability to maintain attention and concentration for extended periods; in ability to interact appropriately with the public; and an ability to respond to change. She concluded that the claimant could understand, remember, and carry out very short and simple instructions, and that he could maintain attention and

4

concentration for 2 hour periods. She recommended that public contact be infrequent, and that change in the work setting be minimal.

.    .    .

The claimant went to Southwest Alabama Mental Health on December 4, 2006, and complained of depression. The diagnosis was major depression with psychotic features. The claimant's GAF was rated at 65, which, according to the *DSM-IV*, indicates mild symptoms. Additional treatment notes clarify that the claimant reported complaints of night-time auditory hallucinations and feelings of paranoia.

Robert Estock, M.D., a state agency medical consultant, reviewed the evidence of record on January 8, 2007, and completed a psychiatric review technique form on which he indicated that the claimant had affective, anxiety, personality, and substance abuse disorders. He also completed a mental residual functional capacity assessment on which he reported that the claimant was moderately limited in ability to understand, remember, and carry out detailed or complex instructions; in ability to maintain attention and concentration for extended periods; in ability to interact appropriately with the public; and in ability to respond to change. He concluded that the claimant could understand, remember, and carry out very short and simple instructions, and that he could maintain attention and concentration for 2 hour periods. He recommended that public contact be infrequent, and that change in the work setting be minimal.

On January 9, 2007, William Wilkerson, M.D., a psychiatrist at Mental Health, submitted a letter to child support court in which he stated that the claimant had not worked since 1998, that he had applied for disability, and that he was disabled. In another letter dated May 1, 2007, Dr. Wilkerson reported that the claimant was unable to work due to an emotional disorder.

.    .    .

Dr. DeFrancisco re-evaluated the claimant on a consultative basis on August 5, 2007. The claimant complained of mental problems. He reported nervousness and stated that he passed out about once a year. Dr. DeFrancisco observed that the claimant was very angry and bitter. The claimant was somewhat paranoid, but not delusional. Insight was adequate but the claimant tended to blame others for his problems. His effort during testing waxed and waned. Dr. DeFrancisco stated that the claimant was able to remember instructions, but that he had a significant attitude problem. Dr. DeFrancisco reported diagnostic impressions of mental disorder not otherwise specified and ruled out paranoid personality. He estimated that the claimant was moderately impaired in ability to respond appropriately to supervision, co-workers, and the public; in ability to use judgment in making work-related decisions; in ability to respond appropriately to change; in ability to understand,

remember and carry out instructions; in ability to maintain attention and concentration for 2 hour periods; in social functioning; and in activities of daily living.

Mental Health treatment notes dated August 7, 2007, indicated that the claimant wanted to restart Prozac. He stated that he was in trouble for growing marijuana. He admitted drinking a 12-pack of beer daily. Dr. Wilkerson reported that alcohol abuse was present.

On August 21, 2007, Dr. Wilkerson completed a mental residual functional capacity assessment on which he indicated that the claimant was moderately impaired in activities of daily living; in social functioning; in concentration, persistence or pace; and in ability to perform simple or repetitive tasks. He estimated marked impairments in ability to respond appropriately to pressure; in ability to understand, remember, and carry out instructions; and in ability to respond appropriately to supervisors and co-workers. Dr. Wilkerson stated that the claimant's mood disorder was separate from substance abuse and was not caused by it.

A Mental Health review of the claimant's case was performed on January 15, 2008. Dr. Wilkerson reported diagnoses of major depression with psychotic features and alcohol dependence. He estimated a GAF of 65 for current functioning and for functioning over the past year. A treatment note dated August 15, 2008, indicates that the claimant reported that his hallucinations had nearly resolved.

On February 19, 2009, Dr. Wilkerson completed a mental residual functional capacity assessment on which he indicated that the claimant was moderately impaired in activities of daily living and in ability to understand, remember, and carry out instructions. He estimated mild impairment in ability to perform simple or repetitive tasks. He estimated marked impairments in social functioning; in concentration, persistence or pace; in ability to respond appropriately to pressure; and in ability to respond appropriately to supervisors and co-workers.

**4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).**

.      .      .

The claimant's mental impairments, including the substance use disorder, do not meet listings 12.04, 12.06, 12.08, or 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated

episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting at least 2 weeks.

In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has marked difficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. There is no evidence of any extended episode of decompensation.

Because the claimant's mental impairments, including the substance use disorder, do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph[] B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. Specifically, there is no indication of repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. With regard to anxiety, there is no indication of complete inability to function independently outside the area of one's own home.

**5.      After careful consideration of the entire record, the undersigned finds that, based on all of the impairments, including the substance abuse disorder, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is unable to perform overhead reaching and is unable to work around unprotected heights and dangerous moving equipment. He is unable to perform work requiring complex or detailed instructions, but can perform work involving 1-2 step job instructions. He is limited to routine work with minimal changes in job settings. He is unable to tolerate public contact and is limited to minimal contact**

**with co-workers and supervisors. He is unable to meet the routine attendance and production requirements of work about one day a week.**

After careful consideration of all the evidence, the undersigned finds that the claimant is credible in that he can be expected to have substantial difficulty maintaining employment when the effects of substance abuse are considered. The claimant has reported an extensive history of violence and criminal activity which were apparently associated with substance abuse, and which apparently have greatly decreased since he curtailed his intake of drugs and alcohol. In light of this history, it may be concluded that, with the effects of substance abuse, the claimant is unable to perform activities requiring any public contact and that he is limited to minimal contact with supervisors and co-workers. Moreover, he would be expected to have difficulty meeting attendance and production requirements on at least a weekly basis.

In making these conclusions, I give substantial weight to the assessments of Dr. Oas, Dr. Rowland, and Dr. DeFrancisco. On each occasion, the claimant indicated that his substance abuse was in partial or complete remission, and the examiners assessed functional limitations accordingly. However, each of the examiners described a history of substance-related difficulties which were serious and prolonged. I therefore find that, considering the effects of substance abuse, the claimant would be significantly limited in his ability to sustain work activity, as set forth above.

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as a construction worker, concrete truck driver, and sanitation worker. At the hearing, the vocational expert was asked to classify the claimant's past work by skill and exertional level. She responded that the claimant had worked as a construction worker II (*Dictionary of Occupational Titles* No. 869.664-014), a semi-skilled job in the heavy range of exertion; concrete truck driver (*DOT* No. 900.683-010), a semi-skilled job in the medium range of exertion; and sanitation worker (*DOT* No. 995.687-002), an unskilled job in the very heavy range of exertion.

Given the claimant's restriction to a limited range of light work, it is concluded that the claimant is unable to perform any of his past relevant work.

**7.      The claimant was born on January 16, 1964, and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.      The claimant's acquired job skills do not transfer to other occupations within the residual  functional capacity defined above (20 CFR 404.1568 and 416.968).**

**10.      Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorder, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).**

.      .      .

If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations from all of the impairments, including the substance use disorder. To determine the extent of erosion of the unskilled light occupational base caused by these limitations, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors there are no jobs in the national economy that the individual could perform.

Based on the vocational expert's testimony, the undersigned concludes that, considering all of the claimant's impairments, including the substance use disorder, the claimant is unable to make a successful vocational adjustment to work that exists in significant numbers in the national economy. A finding of "disabled" is therefore appropriate under the framework of the above-cited rule.

**11.      If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.**

Cessation of substance abuse would not be expected to have any effect on the claimant's musculoskeletal condition. Moreover, while the evidence as a whole suggests that the claimant's mental impairments are responsive to treatment and that his symptoms are ameliorated by abstinence, the impairments would continue to have a moderate effect on functioning even if the claimant were to quit using any drugs or alcohol.

**12.      If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or**

**medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).**

As noted previously, cessation of substance abuse would not be expected to have any effect of the claimant's musculoskeletal condition.

If the claimant stopped the substance use, the remaining limitations would not meet or medically equal the criteria of listings 12.04, 12.06, or 12.08. In terms of the "paragraph B" criteria, the claimant would have mild restriction in activities of daily living if the substance abuse was stopped. In social functioning, the claimant would have moderate difficulties if the substance use was stopped. With regard to concentration, persistence or pace, the claimant would have moderate difficulties if the substance use was stopped. The claimant would experience no episodes of decompensation if the substance use was stopped.

Because the remaining limitations would not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria would not be satisfied if the claimant stopped the substance use.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

As discussed above, the evidence fails to establish the presence of the "paragraph C" criteria in this case.

**13.    If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is unable to perform overhead reaching and is unable to work around unprotected heights and dangerous moving equipment. He is limited to minimal public contact. He is unable to perform work requiring complex or detailed instructions, but can perform work involving 1-2 step job instructions. He is limited to routine work with minimal changes in job settings.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in

accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

At the hearing, the claimant testified as follows: He is 45 years old. He is married and lives with his wife, who is disabled. She is disabled due to mental problems and spine and knee problems, but does not have addiction problems. The claimant can't comprehend reading. He can't write or spell well. He went to school through 11th grade in regular classes. He used to work in construction. He was involved in framing wood and steel construction. He stopped working because of chest pain, blacking out, a neck and back injury incurred when a beam fell on his head, and mental problems. He also worked in 1987 and 1988 as a concrete truck driver. He passed out and wrecked a truck in 1987. He worked for a sanitation service hauling garbage for 1½ years. He goes to the emergency room for treatment. He has lied to doctors to get help. He has not worked for anybody since 1998. He moved to Alabama from Florida around 1999 to 2001. He was married and his wife was working. He does not do drugs or drink whiskey anymore. He last drank whiskey at Christmas 4 years ago. He occasionally drinks a beer on holidays or weekends. The last time he used marijuana was 6 or 7 months ago. He is on probation for 2 years. He has a hard time thinking about his children. He has grandchildren but can't see them. People pick on him. It is hard to approach people because they look down on him. He didn't really start drinking and using drugs [until] 1997 or 1998 when he was married to his second wife. He had problems with depression and paranoia. People started messing with him and he would fight. His last fight was with a neighbor 2 years ago. He has neck problems because a beam hit him on the head and messed up 2 discs. The discs were repaired. He has 2 fingers that are numb. His legs go out on him. He has no medical coverage. He went to jail for child support a number of times. In May 2001, he went to D.W. McMillan Hospital because he hurt his right hand in a fight. He had a splint on his right 4th

finger. He told his treating physician in 1999 that he was an alcoholic. He has a probation officer in Conecuh County. They do drug screening, but he has not failed a drug test. Dr. Wilkerson told him he had to stop alcohol and illegal drugs. He takes Prozac, Seroquel, and [T]razodone. It helps, but he still has nightmares. A caseworker comes once a month to his home and talks to him. He continues his appointments. He sees the probation officer every month in Evergreen. He is on probation for 2 years. He doesn't socialize anymore. They drink and are violent and want to fight. He and his wife go to shop for groceries. They go fishing every 5 or 6 months. His wife goes to every appointment with him. She goes in with him and sets up his medications daily. He can set them up, but he doesn't do it. He forgets to take his medications at times. He gets jittery when he forgets his medications. He gets really nervous and stressed out. He has trouble understanding things he reads. His wife explains paperwork to him. He can't remember or understand. He has been married for 7 years. His wife has been on disability for 3 years. She has major depression.

The medication list submitted by the claimant indicates that he takes [F]luoxetine 80 mg daily for mental disorder, [T]emazepam 15 mg daily for sleep disorder, and Seroquel 200 mg daily for anxiety disorder.

If the claimant stopped the substance use, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

The claimant currently carries a diagnosis of major depression with psychotic features. He has been diagnosed on several occasions with anxiety and personality disorder. It is difficult to separate the signs and symptoms of the claimant's mental impairments from those of substance abuse but, overall, there is no reason to suppose that his mental impairment would not be amenable to control with treatment and appropriate compliance. In fact, the most recent Mental Health note dated August 18, 2008, indicates that the claimant's auditory hallucinations had nearly resolved. Mental status examinations performed by consultative examiners have been largely unremarkable, and estimates of functioning set forth by the consultative examiners and Mental Health personnel have generally described no more than moderate functional limitations. Dr. Wilkerson's residual functional capacity assessments were apparently based on the claimant's subjective report of his own symptoms. The most current available Mental Health notes, which were completed by Dr. Wilkerson, indicate a GAF of 65, suggestive of mild symptoms and good stability. Dr. DeFrancisco's August 2007 report reflects that the claimant was quite angry and bitter about the denial of disability benefits, but the examiner reported that the claimant had a significant attitude problem and blamed others for all his difficulties. The record as a whole does not

establish that the claimant's mental impairments are disabling when considered separately from substance abuse.

In fact, the record suggests that the claimant's symptoms have been substantially aggravated by substance abuse. While he has claimed periods of remission, the objective evidence fails to substantiate his allegations. The claimant told Dr. DeFrancisco in August 2007 that he had quit drinking 3 years previously, but Mental Health progress notes from the same month indicate that the claimant was abusing alcohol, specifically that he was consuming a 12 pack of beer daily and that he was in trouble for growing marijuana. Dr. Wilkerson's contention that his August 2007 assessment was based strictly on the claimant's mental impairments apart from substance abuse is not supported by his own Mental Health treatment notes, which indicate only mild to moderate limitations. Moreover, Dr. Wilkerson reported that the claimant was actively abusing alcohol in a treatment note generated the same month that Dr. Wilkerson completed the assessment. The claimant himself testified that he first started abusing drugs and alcohol around 1998 or 1999. His earnings records indicate that, although his work was somewhat sporadic, he did continue to work until that time. Presumably, the claimant's mental impairments, which have occasionally been attributed to a childhood history of physical abuse, existed before the claimant started using drugs and alcohol. The claimant's work history demonstrates that he was capable of sustaining work despite his affective, anxiety, and personality problems. The claimant's mental impairments, while they would be expected to have more than a minimal effect on functioning, were not originally disabling, although they were subsequently exacerbated by substance abuse.

I give substantial weight to the opinions of the consultative examiners, Dr. Oas, Dr. Rowland, and Dr. DeFrancisco, and to Dr. Wilkerson's Mental Health progress notes, which, considered collectively, reflect that the claimant had no more than moderate functional limitations. The stated opinions are well supported by clinical examinations and testing, as discussed above, and are generally consistent with the record as a whole.

I give little weight to the mental residual functional capacity assessments and disability statements of Dr. Wilkerson, which are inconsistent with the conclusions of the consultative examiners and which are contradicted by his own progress notes indicating that he estimated only mild to moderate functional limitations.

It is concluded that the claimant's mental impairments limit him to minimal public contact and preclude the performance of work requiring complex or detailed instructions. However, the claimant can perform work involving 1-2 step job instructions. He is limited to routine work with minimal changes in job settings. Additionally, given his complaints of chest pain and syncope, which have been found to be related to anxiety,

he has a restriction against exposure to unprotected heights and dangerous moving equipment.

.     .     .

**14.    If the claimant stopped the substance abuse, the claimant would continue to be unable to perform past relevant work (20 C.F.R. 404.1565 and 416.965).**

As discussed previously, the claimant's limitation to a restricted range of light work would preclude performance of any of his past work, even if he discontinued substance abuse.

**15.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.**

**16.    If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).**

If the claimant stopped the substance use, the claimant would not have the residual functional capacity to perform the full range of light work. To determine the extent of erosion of the unskilled light occupational base caused by the limitations that would remain, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and the residual functional capacity the claimant would have if he stopped the substance use. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as small parts assembler (*DOT* No. 706.684-022), with 4,630 jobs existing in the state of Alabama and 288,480 nationally; agricultural produce sorter (*DOT* No. 529.687-186), with 670 jobs existing statewide and 40,770 nationally; and laundry sorter (*DOT* No. 361.687-014), with 8,750 jobs existing statewide and 472,900 nationally.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the vocational expert's testimony, the undersigned concludes that, if the claimant stopped the substance use, he would be capable of making a successful adjustment to work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of 202.18.

**17.     Because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g) and 416.920(g)), the claimant's substance use disorder is a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).    Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.**

(Tr. 823, 823-824, 824, 825, 826, 827, 827-828, 828-829, 829-832, 832-836 & 837-838 (most internal citations omitted).)  The Appeals Council affirmed the ALJ's decision (Tr. 804-806)[2] and thus, the hearing decision became the final decision of the Commissioner of Social Security.

---

[2]     In addressing the plaintiff's "letter of exceptions" the Appeals Council noted the following:

> The Administrative Law Judge stated that she was not concurring with Dr. Wilkerson's opinions as they are not supported by his own treatment notes which documented only mild to moderate limitations. In opposition to that, you cited Dr. Wilkerson's diagnoses and the fact that he prescribed medication. You also noted that the claimant periodically reported auditory hallucinations. None of these factors support the extreme limitations set by Dr. Wilkerson, and the Administrative Law Judge appropriately rejected them.

> You also asserted that the Administrative Law Judge improperly concluded that the claimant would not be disabled if he stopped substance abuse in that he gave significant weight to the findings of the consultative examiners who did not themselves comment on whether substance abuse is a contributing factor to the claimant's mental illness. The assessments of those examiners are not indicative of a disabling impairment regardless of substance abuse. The Administrative Law Judge's findings are supported by substantial evidence.

(*Id*. at 804.)

## DISCUSSION

In making a social security disability determination, the Commissioner employs a five-step sequential evaluation process. *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of proof at each of the first four steps of the process, which are: (1) whether he is currently performing substantial gainful activity; (2) whether he has severe impairments; (3) whether his severe impairments meet or medically equal a listed impairment; and (4) whether he can perform his past relevant work. *See id*. at 1237-1239. It is only at the fifth step of the sequential evaluation process that the burden shifts to the Commissioner, who must establish that there are a significant number of jobs in the national economy that the claimant can perform. *See id* at 1239-1240. In addition to the foregoing, the Contract with America Advancement Act of 1996 ("CAAA"), codified as amended at 42 U.S.C. § 423(d)(2)(C), "amended the Social Security Act to preclude the award of benefits when alcoholism or drug addiction is determined to be a contributing factor material to the determination that a claimant is disabled." *Doughty v. Apfel,* 245 F.3d 1274, 1275 (11th Cir. 2001). Therefore, in those cases in which the Commissioner "determines a claimant to be disabled and finds medical evidence of drug addiction or alcoholism, the Commissioner then 'must determine whether . . . drug addiction or alcoholism is a contributing factor material to the determination of disability.'" *Id*. at 1279, quoting 20 C.F.R. § 404.1535. The Eleventh Circuit went on to note that the "key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability . . . is whether the claimant would still be found disabled if he stopped using drugs or alcohol." *Id*., citing 20 C.F.R. § 404.1535(b)(1). As for who bears the burden of proof with respect to this materiality determination, the *Daughty* court agreed with the Fifth Circuit's decision in *Brown v. Apfel*, 192 F.3d 492 (1999) and held that "the claimant bears

16

the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination." *Id.* at 1280 (other citation omitted); *see also id.* at 1276 ("We hold, as a matter of first impression in this Circuit, that the claimant bears that burden.").

As reflected above, the ALJ performed the required five-step sequential analysis twice. In performing the first five-step inquiry, the ALJ assumed Whitehead was still using alcohol and drugs. (*Compare* Tr. 823 *with* Tr. 833.) At step one, the ALJ determined that plaintiff has not engaged in substantial gainful activity since May 15, 1998, the alleged disability onset date. (Tr. 823.) At step two, the ALJ determined that Whitehead suffers from the following severe impairments: "**substance abuse disorder, affective depressive disorder, generalized anxiety disorder, personality disorder, and cervical spondylosis**[.]" (*Id.*) At the third step, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 830.) The ALJ then determined "**based on all of the impairments, including the substance use disorder, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is unable to perform overhead reaching and is unable to work around unprotected heights and dangerous moving equipment. He is unable to perform work requiring complex or detailed instructions, but can perform work involving 1-2 step job instructions. He is limited to routine work with minimal changes in job settings. He is unable to tolerate public contact and is limited to minimal contact with co-workers and supervisors. He is unable to meet the routine attendance and production requirements of work about one day a week.**" (Tr. 831.) At step four, the ALJ found Whitehead unable to perform any of his past relevant work (*id.*) and, at the fifth step, that "**based on all of the impairments,**

17

including the substance use disorder, there are no jobs that exist in significant numbers in the national economy that the claimant can perform[.]" (Tr. 832.)

The ALJ then made a second five-step sequential inquiry and made findings as "[i]f the claimant [had] stopped the substance use[.]" (Tr. 833.) In this second inquiry, the ALJ found at step two that "the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments." (*Id*.) At the third step, the ALJ determined that absent substance use Whitehead still "would not have an impairment or combination of impairments that meets or medically equals any of the [listed] impairments[.]" (*Id*.) The ALJ found that absent substance use, "the claimant would have the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is unable to perform overhead reaching and is unable to work around unprotected heights and dangerous moving equipment. He is limited to minimal public contact. He is unable to perform work requiring complex or detailed instructions, but can perform work involving 1-2 step job instructions. He is limited to routine work with minimal changes in job settings." (*Id*. at 833-834.) At step four, the ALJ concluded that the plaintiff "would continue to be unable to perform past relevant work[.]" (Tr. 837.) However, at step five, the ALJ determined that in light of the vocational expert's testimony, and within the framework of Rule 202.18 of the Medical-Vocational Guidelines, "there would be a significant number of jobs in the national economy that the claimant could perform" should plaintiff stop the substance use. (*Id*.) Because the ALJ determined that substance use was a contributing factor material to the determination of disability, she concluded that Whitehead was not under a disability from May 15, 1998 through the date of the decision (September 25, 2009). (Tr. 838.)

This Court reviews a social security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See, e.g., Lewis v. Callahan,* 125 F.3d 1436, 1439 (11th Cir. 1997). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *compare also Somogy v. Commissioner of Social Security*, 366 Fed.Appx. 56, 62 (11th Cir. Feb. 16, 2010) ("Substantial evidence is more than a scintilla . . . ." (citation omitted)) *with Hillsman v. Bowen,* 804 F.2d 1179, 1181 (11th Cir. 1986) (an ALJ's decision "cannot stand with a 'mere scintilla' of support[]"). Even if the evidence preponderates against the Commissioner's decision, that decision must be affirmed if it is supported by substantial evidence. *Compare id.* ("The decision of the ALJ need not be supported by a preponderance of the evidence[.]") *with Sewell v. Bowen,* 792 F.2d 1065, 1067 (11th Cir. 1986) ("Even if the evidence preponderates against the [Commissioner], we must affirm if the decision is supported by substantial evidence."). And while this Court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner,]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citation omitted), it nonetheless "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ[,]" *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983) (citations omitted); *see also Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) ("In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision.").

With these principles in mind, the undersigned turns to a consideration of the three issues raised by the plaintiff in this case, that is, his arguments that: (1) the ALJ

erred in rejecting the opinion of his treating psychiatrist; (2) the ALJ erred in substituting her opinion for that of the treating psychiatrist; and (3) the ALJ failed to comply with 20 C.F.R. §§ 404.1535 and 416.935 "in finding that substance abuse was a contributing factor material to the determination of [his] disability." (Doc. 14, at 3.) This Court's focus will be upon the third issue raised by plaintiff and from a discussion of whether the ALJ properly determined that Whitehead's drug addiction or alcoholism is a contributing factor material to the determination of disability, the undersigned will consider plaintiff's "treating psychiatrist" and "substitution" contentions. That this approach is appropriate is apparent given plaintiff's contention that these latter two issues "are closely related to [the ALJ's] findings that substance abuse was a contributing factor material to the determination of plaintiff's disability." (Doc. 14, at 15.)

Plaintiff contends that the ALJ failed to comply with 20 C.F.R. §§ 404.1535 and 426.935 in finding that substance abuse was a contributing factor material to a determination of plaintiff's disability by ignoring "findings of the claimant's mental health professionals and leap[ing] to the conclusion that a mental illness is not disabling if aggravated by substance abuse." (Doc. 14, at 16-17; *see also id*. at 16 (citing as evidence of such "leaping" the ALJ's concession that "'[i]t is difficult to separate the signs and symptoms of the claimant's mental impairments from those of substance abuse but, overall, there is no reason to suppose that his mental impairments would not be amenable to control with treatment and appropriate compliance[]'" and the ALJ's conclusions that "'[t]he record as a whole does not establish that the claimant's mental impairments are disabling when considered separately from substance abuse[]'" and "'the record suggests that the claimant's symptoms have been substantially aggravated by substance abuse.'").) The undersigned cannot agree with plaintiff that the ALJ in this

20

case "leapt" to any unreasonable conclusions or otherwise failed to comply with 20 C.F.R. §§ 404.1535 and 416.935 in finding that substance abuse was a contributing factor material to a determination of plaintiff's disability; instead, a review of the ALJ's decision in this case reveals a copious review of all record evidence from the alleged onset date of May 15, 1998 through the date of the decision and a detailed explanation by the ALJ of why the evidence in the record as a whole supports the conclusion that Whitehead's substance abuse is a material contributing factor. In other words, contrary to plaintiff's contention, substantial evidence supports the ALJ's conclusion that substance abuse is a contributing factor material to plaintiff's disability and plaintiff, as a consequence, has not carried his burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination.

The ALJ's "two-time" performance of the five-step sequential inquiry, as synopsized above, certainly reflects that the hearing officer drafted her decision in compliance with 20 C.F.R. §§ 404.1535 and 416.935. The undersigned would note that there are references in the record to plaintiff's abuse of alcohol and drugs exacerbating his mental impairments, or, otherwise, records indicating that when alcohol and drugs are taken away and psychiatric medications adjusted there is a concomitant decrease in symptoms (*see, e.g.*, Tr. 667-693 (medical records from April and May of 2003 reflect that plaintiff was seen in the emergency room for treatment of cutting his wrists following his alcohol-infused altercation with his wife's son and subsequent confinement in jail and later psychiatric hospitalization for six days where he was medicated for alcohol withdrawal symptoms and psychiatric medications were adjusted, which, when combined with individual and group therapy, resulted in sustained improvement in that he no longer had thoughts of wanting to hurt himself or others); Tr. 493 (June 23, 2002 hospital report linking increase in anxiety with use of alcohol, the admitting

21

physician specifically noting that plaintiff had "allegedly [] completed some periods of sobriety prior to my caring for him on 10/01 and recently states that the reason that he has been drinking and having a great deal of anxiety is because while under the care of Dr. Yearwood, at the Tri-City Medical Clinic in Evergreen, he was sent to an orthopedic surgeon in Montgomery, who told him he needed surgery on his back, but because of lack of financial insurance, was told to get a second opinion.")),[3] all of which stand in stark contrast to the various reports of consultative psychologists reflecting, at best, either moderate psychiatric limitations caused by plaintiff's psychiatric impairments where plaintiff reported non-use of alcohol and drugs (*compare* Tr. 710 (Dr. Robert DeFrancisco's August 18, 2003 consultative report wherein the conclusion was drawn, following examination and review of the record, that plaintiff would be able to "carry out, remember instructions, and handle simple work pressures," from a psychological standpoint) *with* Tr. 961-964 (Dr. DeFrancisco's follow-up consultative report dated July 30, 2007 wherein the consultant indicated that plaintiff appeared capable of "remember[ing] simple instructions[]" and was moderately limited in all spheres) or, otherwise, a clear ability to handle financial affairs, regardless of any reported substance abuse (*compare* Tr. 319 (August 31, 1999 report from Dr. Oas indicating that plaintiff was "mentally competent for pay and records purposes[]") *with* Tr. 342 (Dr. Kent Rowland's February 19, 2001 assessment that plaintiff appeared "capable of managing his own funds[]") and Tr. 961 (Dr. DeFancisco's 2007 assessment that plaintiff appeared "to have enough intellectual ability to handle his benefits[]"), *see Doughty,*

---

[3]    The record also reflects evidence that plaintiff's substance abuse, particularly his abuse of alcohol, has exacerbated or been the root cause of some of his physical maladies. For instance, there is record evidence from late 2001 (*see* Tr. 411-489) that Whitehead's persistent vomiting was related to his abuse of alcohol (*see, e.g.,* Tr. 468 ("Persistent gastroenteritis, probably alcoholic gastritis[.]")).

*supra,* 245 F.3d at 1281 (finding it significant that a medical source had stated "he believed Doughty was capable of handling his own financial affairs[]"). Moreover, a copious review of the clinical notes of Whitehead's treating psychiatrist, Dr. William Wilkerson, does not foreclose the appropriateness of the ALJ's determination that substance abuse is a contributing factor material to plaintiff's disability determination inasmuch as Wilkerson's clinical notes dated August 7, 2007 detail plaintiff's alcohol and marijuana abuse, along with reports of auditory hallucinations (*see* Doc. 999 ("'people outside talking'")), and, some two weeks later, on August 21, 2007, Wilkerson is only able to comment on his mental residual functional capacity evaluation of plaintiff (*see* Tr. 995-996) that plaintiff's "Mood Disorder is separate from his substance abuse and is not caused by it." (*Id.* at 996.) This conclusion by Dr. Wilkerson, of course, betrays no indication that plaintiff's substance abuse does not exacerbate his mood disorder. Indeed, Dr. Wilkerson's prominent mention of plaintiff's substance abuse in his comment section suggests that he was considering both impairments in completing the RFC form. (*See* Tr. 996.) Further, as correctly noted by the ALJ, Whitehead's claimed periods of remission—or the absence of alcohol abuse—is not consistent with the objective medical evidence (*see* Tr. 835). *See Payne v. Astrue,* 2012 WL 1190852, *8 (M.D. Ala. Apr. 10, 2012) (reflecting that a claimant's credibility is significant with respect to the "material factor" analysis, the court specifically observing that the evidence of record established "that the ALJ was correct in his credibility finding when Payne acknowledges in a social security questionnaire that he still drank six to twelve beers a day on November 24, 2008, and then on the next day, as part of his progress notes in alcohol treatment, insists that he is not drinking.").) More specifically, on August 5, 2007, Whitehead reported to Dr. DeFrancisco that he quit drinking three years earlier (Tr. 959 ("He used to have an alcohol problem, but he says he ha[s] been off alcohol for

three years."")), yet only two days later, on August 7, 2007, Dr. Wilkerson's office notes reflect plaintiff's report that he had just recently quit smoking marijuana after getting into trouble for growing the drug and his further admission that he was drinking a 12-pack of beer daily (Tr. 999).[4]

Based on all of the foregoing, therefore, this Court finds that the ALJ's determination that Whitehead's substance abuse is a contributing factor material to his disability is supported by substantial evidence. The fact that some of the evidence, all of which the ALJ considered in her lengthy opinion, might suggest otherwise is of no moment given that substantial evidence supports the ALJ's determination in this regard. Nor does the ALJ's admission regarding the difficulty of "separating the signs and symptoms of the claimant's mental impairments from those of substance abuse" (Tr. 835) detract from the hearing officer's ultimate conclusion; instead, such difficulty is nothing more than a reflection of the contents of the medical reports.

Looking at the other side of the coin, plaintiff's reliance on the various opinions of Dr. Wilkerson to carry his burden of demonstrating that his alcoholism or drug addiction is not a contributing factor material to his disability need fail inasmuch as the ALJ in this case properly assigned little weight to the treating psychiatrist's mental residual functional capacity assessments (Tr. 995-996 & 1072-1073) and disability statements (Tr. 973 & 997).

---

[4]     Plaintiff admitted during the hearing that he still consumes alcohol and although Whitehead stated he only drinks a beer on holidays or the weekends (*see* Tr. 1115), it is impossible for this Court to appropriately understand how an individual like Whitehead, an admitted alcoholic, can control his alcohol intake after years of abuse.

The Eleventh Circuit has determined that "the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis, supra*, 125 F.3d at 1440.

> The ALJ must clearly articulate the reasons for giving less weight to the opinion of the treating physician, and the failure to do so is reversible error. We have found "good cause" to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their own medical records.

*Id*. (internal citations omitted); *see also Phillips supra*, 357 F.3d at 1241 ("'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). The Eleventh Circuit has also made clear that "[w]here the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence," a reviewing court may not "disturb the ALJ's refusal to give the opinion controlling weight." *Carson v. Commissioner of Social Security Administration*, 300 Fed.Appx. 741, 743 (11th Cir. Nov. 21, 2008) (citation omitted).

The Court finds that the ALJ articulated good cause for according little weight to Dr. Wilkerson's opinions regarding plaintiff's mental RFC and other disability statements. (Tr. 836.) The ALJ correctly noted that neither the evidence of record as a whole or Dr. Wilkerson's own findings in his treatment notes support the severity of limitations found by plaintiff's treating psychiatrist. (*Compare* Tr. 995-996 (Wilkerson's August 21, 2007 findings that plaintiff would have marked limitations in responding appropriately to supervision and co-workers in a work setting and customary work pressures, as well as marked limitations in understanding, carrying out and remembering instructions in a work setting) and Tr. 1072-1073 (Wilkerson's February

17, 2009 findings that plaintiff would have a marked impairment in maintaining social functioning; a marked deficiency in concentration, persistence and pace; and marked limitations in responding appropriately to supervision and co-workers in a work setting and customary work pressures) *with* Tr. 316-319, 339-343, 382, 707-710, 711-714, 727, 951-953 & 958-964 (the reports and/or assessments of examining and non-examining consultative psychologists reflecting, at best, moderate limitations in all areas impacting employment for which Dr. Wilkerson indicated there were marked limitations, or otherwise indicating that plaintiff was competent to manage his own funds or benefits) and Tr. 1067 (in signing plaintiff's 2008 treatment plan on January 15, 2008, Dr. Wilkerson noted Whitehead's 2007 GAF score to be 65, the same as his current year—2008—score, same indicating, as pointed out by the ALJ, "mild symptoms and good stability"[5]).[6] Moreover, the undersigned is of the opinion that the various limitations noted by Dr. Wilkerson on the two assessments are suspect given the treating psychiatrist's indication that plaintiff's ability to perform simple and repetitive tasks in

---

[5]    "A GAF score of 61-70 indicates: some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, [with] some meaningful interpersonal relationships." *Regul v. Astrue*, 2010 WL 1189351, *5 n.2 (N.D. Fla. Feb. 22, 2010) (citation omitted), *report and recommendation adopted by,* 2010 WL 1189348 (N.D. Fla. Mar. 23, 2010); *compare id. with Rodrigue v. Astrue*, 2011 WL 6961022, *6 (M.D. Fla. Dec. 6, 2011) ("A GAF score of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning[.]"),*report and recommendation adopted by,* 2012 WL 37227 (M.D. Fla. Jan. 6, 2012).

[6]    Dr. Wilkerson's January 9, 2007 letter to a child support judge opining that plaintiff is disabled (Tr. 973) and his May 1, 2007 "To Whom It May Concern" letter opining plaintiff's inability to work (Tr. 997) were properly rejected by the ALJ as unsupported by the evidence. Moreover, these opinions are conclusory and, therefore, were properly rejected. *See Lewis, supra,* 125 F.3d at 1440. Indeed, it is clear that the precipitating event for Dr. Wilkerson's penning of the first letter was plaintiff telling his treating psychiatrist that he needed a letter stating he was disabled. (Tr. 985 ("Pt being threatened [with] jail over child support. He needs a letter saying he is disabled. He hasn't worked since 1998. He's been attending Mental Health since 2002.").)

a work setting, as well as his ability to understand, carry out and remember instructions in a work setting, improved from the first assessment in 2007 to the second assessment in 2009 (*compare* Tr. 995-996 (2007 assessment indicates a marked limitation in Whitehead's ability to understand, carry out and remember instructions in a work setting, and moderate limitations in plaintiff's ability to perform simple and repetitive tasks in a work setting) *with* Tr. 1072-1073 (2009 assessment indicates a moderate limitation in Whitehead's ability to understand, carry out and remember instructions in a work setting, and mild limitations in plaintiff's ability to perform simple and repetitive tasks in a work setting)), whereas Wilkerson indicated that plaintiff's impairments in social functioning and concentration, persistence and pace had actually gotten worse over the years (*compare* Tr. 995 (2007 assessment indicates a moderate impairment in maintaining social functioning and moderate deficiencies of concentration, persistence and pace) *with* Tr. 1072 (2009 assessment indicates a marked impairment in maintaining social functioning and marked deficiencies of concentration, persistence and pace)), without any explanation for the changes either on the 2009 form or in contemporaneous office notes. For these reasons, therefore, the undersigned is unable to "disturb the ALJ's refusal to give [Dr. Wilkerson's various] opinion[s] controlling weight."[7] *Carson, supra*.[8]

---

[7]     The undersigned would note that given the determination that the ALJ properly declined to give substantial weight to the marked limitations indicated by Dr. Wilkerson on the two mental RFC assessments, Dr. Wilkerson's specific notation on the 2009 form that plaintiff's "psychiatric impairment [would] remain at [those] same levels" even had substance abuse been diagnosed (Tr. 1073) has been stripped of all relevance.

[8]     The undersigned would also note disagreement with plaintiff's contention that the ALJ substituted her opinion for that of the treating psychiatrist, Dr. Wilkerson (*see* Doc. 14, at 12-15). As previously discussed, the ALJ properly rejected Dr. Wilkerson's various disability opinions and substantial evidence of record supports the ALJ's determination that substance abuse was a contributing factor to Whitehead's disability. Just as important, "the ALJ has the ultimate responsibility to assess a claimant's residual functional capacity[,]" *Carson, supra* (Continued)

Based upon the foregoing, it is clear that the Commissioner's decision to deny benefits in this case—on the basis that Whitehead's substance abuse is a contributing factor material to the determination of disability—is both correct and supported by substantial evidence.

### CONCLUSION

It is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 29th day of November, 2012.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

(citations omitted), and since the ALJ's RFC assessment in this case, based on the claimant stopping his substance abuse (*see* Tr. 833-834), is supported by substantial evidence and the vocational expert ("VE") identified jobs which exist in significant numbers in the national economy that an individual with such an RFC can perform (*compare* Tr. 837-838 *with* Tr. 1145-1146), the decision to deny benefits in this case was appropriate.